Per Curiam : This case was referred to 'Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 57(a). The commissioner has done so in an opinion and report filed on January 27, 1969. Also on January 27, 1969, the commissioner filed a memorandum to the court under Buie 57(f) (1) noting that plaintiff filed no brief before the commissioner pursuant to order of the commissioner, although given a time extension; that plaintiff had cited no authorities upon which he relies [Buie 57 (d) ] nor in opposition to defendant’s counterclaim; nor had plaintiff objected to any of defendant’s requested findings [Buie 57 (f) (2) and (3)] ; wherefore, under the rule the court may refuse to consider any of plaintiff’s exceptions to the commissioner’s report. Plaintiff has filed no *555 notice 'of intention to except to tbe commissioner’s report, nor has plaintiff filed a request for an extension of time to do so, and tbe time for so filing pursuant to tbe rules of tbe court bas expired. On January 28, 1969, defendant filed a motion for adoption of tbe commissioner’s report to wbicb plaintiff bas filed no opposition, nor bas plaintiff filed a request for an extension of time to do so, and tbe time for so doing pursuant to tbe rules of tbe court bas expired.
Since tbe court agrees with tbe commissioner’s opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby 'adopts tbe same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is not entitled to recover on bis claim, defendant is entitled to recover on its counterclaim in tbe amount of $3,979.75, and judgment is entered for defendant in that amount. Plaintiff’s petition is dismissed.
OEINION OE COMMISSIONER
Bennett, Chief Commissioner:
Plaintiff, A1 Parker, was employed by tbe United States Post Office at General Post Office, New York City, hereinafter referred to as G.P.O., for 11 years until September 13, 1965, and brings this suit for recovery of a $2,896.65 retirement credit and $63.60 withheld salary check, both of wbicb were set off against a certified indebtedness of $11,940 owing from plaintiff to the Government for bis alleged wrongful appropriation from G.P.O., on 10 occasions, of 36 official registered remittances containing currency.
Tbe Postal Manual requires that smaller post offices keep no more than a certain prescribed amount of currency on band; accordingly, at tbe close of each business day, postmasters at numerous smaller offices near New York City remit excess currency via registered mail to General Post Office Box 163 for the Federal Eeserve Bank in New York City.
After passage through one or more intermediate offices or trains, such remittances arrive for processing at tbe G.P.O. incoming mail room in iron-lock pouches wbicb are opened by a “key-man.” Any registered containers in the pouches *556 are collected and picked up by or delivered to the “registered logger” at a nearby desk.
The registered logger records each registered item in a Manifold Registry Dispatch Book. At intervals, he takes the Dispatch Book and the items he has listed on the transmission sheets therein to the registry cage on the third floor of G.P.O., where the registry clerk checks the logger’s list against the items, accepts the items, and returns a carbon of the transmission sheet to the logger as a receipt. The logger is transported to the registry cage by a special registry elevator which he enters from the floor below the incoming mail room. On this lower floor are several exits through which he can leave and reenter the building prior to or after a trip to the registry cage. In recording the registered items, the logger is not to open any envelopes, except in the case of jackets torn open in transit.
On 10 occasions between 1962 and 1965, losses of registered remittances addressed to Post Office Box 163, via Gr.P.O., occurred. As a result of its investigations of the 10 incidents, involving 36 registered remittances and $11,940 in cash, the Postal Inspection Service determined from circumstantial evidence that plaintiff was responsible for the losses. Accordingly, the Post Office Department filed a request for setoff in the amount of $11,876.40 ($11,940 less plaintiff’s $63.60 withheld salary for his last week) with the Civil Service Commission, which request resulted in denial of plaintiff’s application after resignation for refund of his $2,896.65 retirement credit on the ground that his indebtedness to the Government exceeded the credit.
It is the accuracy of the Post Office Department conclusion that plaintiff was responsible for the losses which poses the main factual issue for decision. Also in controversy is the propriety of the setoff procedure utilized by the Post Office Department through the Civil Service Commission.
II
The evidence establishes not only that plaintiff was on duty at the time of each loss, but that he was working as *557 the logger of registered mail each time. It is farther demonstrated that he failed in each instance to register the remittances which later turned up missing. In addition, plaintiff was the only employee in the vicinity of the incoming mail room at G.P.O. who was on duty on each and all of the 10 occasions of loss.
Investigation indicated that no irregularities had occurred at the offices making remittances of excess currency; each was, therefore, allowed credit in its account for the missing sum, in most instances because of existence of a proper receipt from the larger office or train to which the currency had been dispatched.
The weight of the evidence indicates 'that the iron-lock pouches containing the registered items which later turned up missing arrived intact at the incoming mail room, G.P.O., in each of the 10 instances of loss. In eight cases, G.P.O. records disclose destination labels from the pouches in question, which labels had been removed by the key-man upon arrival and opening at G.P.O. In another instance (July 3,1963), an intermediate office dispatched the remittances on a nonstop truck to New York and there was no complaint of loss of any mail in the pouch other than the remittances. In the remaining incident (May 6, 1962), an intermediate office dispatched the remittances to the Yonkers Metro Registry Section which in turn placed the items on a vehicle trip to Penn Terminal, which trip ran on schedule and without irregularity.
When it became apparent in the course of investigation that plaintiff was consistently serving as registered logger when remittance losses occurred, his activities were carefully watched from a clandestine observation gallery by Inspection Service personnel.
On September 13, 1964, Francis J. Cahill, Investigative Aide, G.P.O., was assigned to observe plaintiff’s behavior from a gallery behind plaintiff’s logging table. He watched plaintiff break the seal on a registered jacket, a prohibited practice, and examine the contents, which would reveal the presence of any remittance envelopes addressed to Box 163 *558 and thus containing currency. The particular jacket contained no such envelopes; plaintiff thereafter logged all the items therein in the Manifold Registry Dispatch Book.
Since plaintiff had been observed engaging in improper and suspicious conduct, and since the charting of employees pointed to him as the only common denominator on duty on every date of loss, several test jackets containing registered remittances were prepared and delivered to plaintiff for logging as part of the ordinary flow of registered mail. Although on several occasions plaintiff properly recorded test items, on September 12, 1965, he handled a test jacket, broke the seal, took out the remittances, and pretended to log the items in the Manifold Registry Dispatch Book. 'He then secreted the jacket, took it to his automobile, and was apprehended. Although he first denied the theft, plaintiff later signed a full confession.
On September 13, 1965, plaintiff submitted a voluntary resignation.
On September 22,1965, plaintiff pleaded guilty to a four-count information and, on October 29, 1965, was given a suspended sentence and 2 years’ probation for his theft of registered mail on September 12,1965.'
Taken as a whole, these facts allow as a reasonable inference the conclusion that plaintiff was responsible for the 10 thefts. The iron-lock pouch in each instance arrived at G.P.O. intact and was opened by the key-man whose sole duty was to collect the registered jackets therein. Each túne, plaintiff was the registered logger; in no case in issue was anyone else serving in that capacity. No other employee, key-man or otherwise, was on duty every time. Thus, the items reached G.P.O. and the plaintiff had unique and recurrent access characteristic of no other person and it was at this point that the losses occurred.
Combine that accessibility with reliable eyewitness testimony of two instances of seal-breaking and perusal of the contents of registered jackets by plaintiff, culminating in theft of a jacket, and the circumstantial web is complete. Nor did plaintiff offer significant contrary proof, other than his uncorroborated denial. The conclusion of the Post Office *559 Department that plaintiff was responsible for the 10 thefts totaling $11,940 must therefore be upheld.[1]
Ill
The Post Office Department requested, and the Civil Service Commission granted, setoff of plaintiff’s $11,940 indebtedness against his $2,896.65 retirement credit and $63.60 withheld salary under authority of 5 TJ.S.C. §82 (1964),[2] which reads in pertinent part as follows:
No money shall be paid to any person for his compensation who is in arrears to the United States, until he has accounted for and paid into the Treasury all sums for which he may be liable. * * *
This procedure has been upheld by decisions of the Comptroller General. 27 Comp. Gen. 703 (1948) (by implication); 39 Comp. Gen. 203,206 (1959) (“This statute [5 U.S.C. § 82] is mandatory, requires the withholding of the compensation of such an accountable officer, and may not be waived.”).
The determination that plaintiff was responsible for the theft of $11,940 in official registered remittances is supported *560 by the evidence and the setoff procedure utilized by defendant is clearly applicable and authorized.[3]
Because defendant has recovered the $2,500 maximum from each of two of plaintiff’s performance sureties, it is accordingly entitled to recover the net sum of $3,979.75 on its counterclaim, representing the amount of loss ($11,940) less total pre-suit recoupment ($63.60 withheld salary, $2,896.65 retirement credit, and $5,000 recovery from sureties).[4]
FindiNgs oi? Fact
1. Plaintiff, A1 Parker, was employed by the United States Post Office at General Post Office, New York City, hereinafter referred to as G.P.O., for 11 years until September 13, 1965, and brings this suit for recovery of a $2,896.65 retirement credit and $.63.60 withheld salary check, both of which were set off against a certified indebtedness of $11,940 owing from plaintiff to the Government for his alleged wrongful appropriation from G.P.O., on 10 occasions, of 36 official registered remittances containing currency.
2. G.P.O. serves as a consolidating point for mail collected from small post offices in the greater metropolitan New York City area. Smaller post offices are allowed to keep only a limited amount of currency on hand at the close of each business day. The Postal Manual requires that currency in excess of the prescribed amount be sent in the form of official registered remittances to the Federal Reserve Bank in New York City, for deposit, via G.P.O. Accordingly, the postmaster at each small office, at the close of each business day, prepares a Form 1901, which identifies the office and lists, by denomination, excess currency to be remitted. He then encloses the Form 1901, the currency and paid money orders or checks in an envelope addressed to Post Office Box 163, New York, New York, and applies a registry number to the enve *561 lope. After registration, the envelope is placed in a sack or a control jacket to be sent to the next larger office or a train. Included therein is a control number form which is receipted and returned by the larger office or train as proof of arrival. Registered jackets are consolidated at larger post offices and on trains and are put into rotary-lock pouches or into registered containers as size and volume demand. Both rotary-lock pouches and registered containers are then placed in iron-lock pouches and labeled to New York, New York.
3. When iron-lock pouches arrive at the G.P.O. incoming mail room, nicknamed and referred to in the record as “the battleship,” their destination labels are checked to determine whether they are to be opened immediately or whether they are to be forwarded directly to another post office without any further processing. The “key-man” unlocks those pouches to be opened, removes their destination labels, and places the labels in a special receptacle. Any registered containers in the pouch are then collected and picked up by or delivered to the “registered logger” at a nearby desk.
A The registered logger then records each registered item in a Manifold Registry Dispatch Book. At intervals, the logger takes the Dispatch Book and the items listed on the transmission sheets therein to the registry cage on the third floor of G.P.O. where the registry clerk checks the logger’s list against the item's, accepts the items, and returns a carbon of the transmission sheet to the logger as a receipt. The logger is transported to the registry cage by a special registry elevator which he enters from the floor below the incoming mail room. On this lower floor are several exits through which he can leave and reenter the building prior to or after a trip to the registry cage. In recording the registered items, the logger is not supposed to open the registered envelopes to view the control card listing the contents thereof. Only if a jacket has been torn open in transit is he to mew the contents and make a report of any losses.
5. Although he was classified as a mail handler, plaintiff sometimes served in the period 1962-65 as the registered logger, particularly on Saturday nights. Documentary evidence shows that he was on duty on 10 occasions between *562 1962 and 1965 when losses of registered remittances occurred at G.P.O. as follows:
May 6, 1962_ $685
September 23, 1962- 1,320
March 23, 1963_ 620
July 3, 1963_ 2,565
December 1, 1963_ 705
January 19,1964- 1,000
June 28, 1964_ 1, 030
September 19,1964- 235
December 31, 1964- 2,180
May 8,1965_ 1, 600
11,940
On each of the 10 days, plaintiff prepared and signed Kegistry Dispatch Book forms as registered logger.
6. The remitting offices involved in the losses on the above-noted dates filed claims with the Post Office Department for credits in the amounts of cash missing. In each case the remitting office was cleared of any negligence or irregularity and given credit in its account for the missing remittance, in most instances because of existence of a proper receipt from the larger office or train to which the currency had been dispatched.
7. The mail pouches containing the registered remittances which later turned up missing were, on all 10 occasions of loss, received intact at G.P.O. for processing at the incoming mail room.
8. On each of the dates of loss, plaintiff, though serving as registered logger, failed to register the specific remittances which later turned up missing.
9. Having ascertained that each of the missing registered remittances had reached the incoming mail room at G.P.O., the Postal Inspection Service began an investigation of the personnel in that area. Included in the investigation was a chart showing employees on duty at the time of each loss. When it became apparent that plaintiff was the only employee on duty on every occasion of loss who clearly had access to the remittances, his activities were carefully watched by Inspection Service personnel.
*563 10. On September 13,1964, Francis J. Cahill, Investigative Aide, Gr.P.O., was assigned to observe plaintiff’s behavior from a gallery behind plaintiff’s logging table. He watched plaintiff break the seal on a registered jacket, a prohibited practice, and examine the contents, which would reveal the presence of any remittance envelopes addressed to Box 163 and thus containing currency. The particular jacket contained no such envelopes; plaintiff thereafter logged all the items therein in the Manifold Eegistry Dispatch Book.
11. Since plaintiff had been observed engaging in improper and suspicious conduct, and since the charting pointed to him as the only common denominator on duty on every date of loss, several test jackets containing registered remittances were prepared and delivered to plaintiff for logging as part of the ordinary flow of registered mail. Although on several occasions plaintiff properly recorded test items, on September IS, 1965, he was observed as he handled a test jacket, broke the seal, took out the remittances, and pretended to log the items in the Manifold Eegistry Dispatch Book. He then secreted the jacket under his shirt, took it to his automobile, and was apprehended. Although he first denied the theft, plaintiff later signed a full confession.
12. On September 13,1965, plaintiff submitted a voluntary resignation from the Postal Service.
13. On September 22, 1965, plaintiff pleaded guilty to a four-count information and, on October 29, 1965, was given a suspended sentence of 2 years’ probation for his theft of registered mail on September 12,1965.
14. Plaintiff subsequently filed Form 2802, Application for Eefund of Eetirement Deductions, which document was received by the Civil Service Commission on September 24, 1965.
15. On the basis of the investigation and charting of the employees working at the incoming mail room on the nights when losses of registered remittances occurred, the Postal Inspection Service determined that plaintiff was the only employee who had the continued opportunity and predisposition to unlawfully appropriate the remittances on each occasion. Accordingly, on November 16, 1965, Chief Postal *564 Inspector H. B. Montague transmitted the request of the Post Office Department for setoff of an $11,876.40 indebtedness of plaintiff to the Civil Service Commission, based on the $11,940 cash lost on the 10 dates specified in finding 5 less plaintiff’s $63.60 salary for his last week of employment.
16. The Befund and Deposit Section, Claims Division, of the Civil Service Commission thereafter denied plaintiff’s request for refund of his $2,896.65 retirement credit on the ground that his indebtedness exceeded the amount of the credit. Plaintiff was so advised on January 3, 1966.
17. Plaintiff’s performance sureties, Liberty Mutual Insurance Company and United Bonding Insurance Company, each paid the Government $2,500 on June 30, 1966, and April 4,1966, respectively, for plaintiff’s thefts. This was the limit of the bond coverage.
CONCLUSION OE Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, that defendant is entitled to recover on its counterclaim in the amount of $3,979.75, and judgment is entered for defendant in that amount. Plaintiff’s petition is dismissed.

 Cf. Boerner v. United States, 30 F. Supp. 635 (E.D. N.Y. 1939), aff’d, 117 E. 2d 387 (2d Cir. 1941), cert. denied, 313 U.S. 587 (1941), a Tucker Act suit by a former Post Office chauffeur-carrier for pension refund, wherein the question of plaintiff’s receipt vel non of certain parcels later to be found missing was resolved in these words :
“ * * * To show, however, that in this ease such presumption [that when an article is mailed its receipt by the addressee is inferred or presumed] would hold only up to receipt of the parcels in ordinary course by plaintiff fox-delivery by him, defendant offered proof, over plaintiff’s objection, of various matters showing plaintiff’s derelictions in his duties. These included the facts that the losses on plaintiff’s parcel post route were ten times or more greater than the average of the other six routes emanating from the Long Island City Post Office until plaintiff was superseded, whereupon they dropped to normal; that when suspicion was thus cast upon plaintiff, a test package was made up for delivery on plaintiff’s route, and its loss was traced to him; that upon search of his automobile certain missing parcels post and government property were discovered; that plaintiff had been guilty of various infractions of the rules, * * * and that plaintiff admitted wrongdoing and pleaded guilty to the charge of embezzling property of the united States.
“We think the evidence was admissible and was effective to prove the point claimed. * * [117 E. 2d at 390.]

 Reenacted as 5 U.S.C. § 5512 (Supp. II, 1964). Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 477. Setoff procedure is set forth in U.S. Civil Service Commission Eederal Personnel Manual Supp. 831-1, Subeh. S19 at 69-70, dated Mar. 2,1966.

 The Government need not await tie outcome of negotiations with sureties prior to withholding salary or retirement funds pursuant to setoff. 27 Comp. Gen. 703 (1948) ; 39 Comp. Gen. 203 (1959).

 The commissioner has filed a memorandum with the court pursuant to Rule 57 (f). The sanctions of that rule permit the court to ignore any exceptions by plaintiff to the commissioner’s decision because of plaintiff’s default in taking exceptions to defendant’s requested findings and failure to file a brief.